## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **FILSAN AHMED, individually and on behalf of her minor children A.F. and S.F., AWIL FALAG, MOHAMED ISMAEL, and ABDIKADIR ALI,**<br><br>  **Plaintiffs,**<br><br>  **v.**<br><br> **AIR FRANCE-KLM, JOHN DOES 1 THROUGH 12, and KONINKLIJKE LUCHTVAART MAATSCHAPPIJ, N.V., d/b/a KLM Royal Dutch Airlines,**<br><br>  **Defendants.** | **1:13-cv-1984-WSD** |

## OPINION AND ORDER

This matter is before the Court on Defendant Koninklijke Luchtvaart

Maatschappij, N.V. d/b/a KLM Royal Dutch Airlines' ("KLM") Motion for

Summary Judgment [108] ("Motion").

I.    **BACKGROUND**[1]

   A.    Introduction

   Plaintiffs Filsan Ahmed, individually and on behalf of her minor children
A.F. and S.F., Awil Falag, Mohamed Ismael, and Abdikadir Ali ("Plaintiffs") are
ethnic Somalis and naturalized American citizens.  (Plaintiff's Statement of
Material Facts [125.1] ("PSOMF") ¶ 3).  Plaintiffs contend that KLM employees in
Nairobi, Kenya, discriminated against Plaintiffs on the basis of their Somali
ethnicity, demanded bribes, and prevented Plaintiffs from boarding their flights to
the United States.  In their First Amended Complaint [5] ("Complaint"), Plaintiffs
allege claims of false imprisonment, fraud, conversion, intentional infliction of
emotional distress, violation of the Georgia RICO Act, violation of 42 U.S.C. §
1981, breach of contract of carriage, breach of covenant of good faith and fair
dealing, negligence, and loss of consortium.

   On April 8, 2015, Plaintiffs voluntarily dismissed [106] Defendants John

---

[1]     As required when considering a motion for summary judgment, the Court
has viewed the evidence and factual inferences in the light most favorable to
Plaintiff, the nonmoving party.  See United States v. Four Parcels of Real Prop.,
941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  To the extent that material facts
are in dispute, the Court has resolved the disputes in Plaintiff's favor.  See
Vaughan v. Cox, 343 F.3d 1323, 1326 n.1 (11th Cir. 2003).  The facts recited in
this section are intended to establish the context of the case.  Additional facts will
also be recited below.

Thumi and Jurriaan Stelder, and, as a result, Plaintiffs' claims against these individual defendants for false imprisonment, fraud, conversion, and intentional infliction of emotional distress (the "Tort Claims") against Mr. Thumi and Mr. Stelder are not pending claims in this action.  The claims that remain against the corporate Defendants Air France-KLM and KLM are claims under the Georgia RICO Act, claims under Section 1981, claims for breach of contract of carriage based on an alleged failure to travel on a KLM flight, breach of good faith and fair dealing for denying Plaintiffs carriage on a KLM flight, loss of consortium resulting from failure to allow Plaintiffs to travel on a KLM flight, negligent hiring and retention, and the Tort Claims for which Plaintiffs allege Air France-KLM and KLM are vicariously liable.

   B.   <u>Facts Pertinent to Plaintiff Mohamed Ismael</u>

   After spending time in Kenya, Plaintiff Mohamed Ismael purchased a ticket to travel to the United States via Amsterdam on a KLM flight departing on June 3, 2011.  (<u>Id.</u> ¶ 6).  After Mr. Ismael passed through airport security prior to his June 3, 2011, flight, he entered the KLM ticket and check-in line, where he was asked to provide his travel documents, including his ticket, re-entry permit, and green card.  (<u>Id.</u> ¶¶ 8-9).  At the ticket and check-in counter, he spoke to a supervisor named "Thumi."  (<u>Id.</u> ¶ 10).  KLM personnel instructed Mr. Ismael to

enter Mr. Thumi's office.  (Id. ¶ 11).[2]

In his office, Mr. Thumi solicited a bribe from Mr. Ismael, which Mr. Ismael refused to pay.  (Id. ¶ 13).  Mr. Thumi told Mr. Ismael that there were issues with his travel documentation, and that Mr. Ismael needed to pay him $400 to get on the flight.  (Id. ¶ 16).[3]

As a result of this incident, Mr. Ismael was not able to board his June 3, 2011, flight.  He was forced to travel the next day, June 4, 2011, after obtaining a new ticket through Delta Airlines, a KLM partner.  (Id. ¶¶ 7, 21). Mr. Ismael testified his economic damages consist of approximately $100 for a hotel on the night of June 3, 2011; $200 for the purchase of a cellular phone and SIM card; $40 for a cab from his hotel to the KLM office in Nairobi; and unspecified amounts for cabs to and from the airport.  (Id. ¶ 20).[4]

---

[2]    Mr. Ismael testified that, while he was in Mr. Thumi's office, the door to the office remained ajar, and no one stood outside of the door.  (Id. ¶ 11-12).
[3]    Mr. Ismael testified that he did not believe Mr. Thumi's statement that there was a problem with his documentation.  (Id. ¶ 17).  Mr. Thumi did not tell Mr. Ismael that he could not leave the office.  (Id. ¶ 15).  Mr. Ismael's documents ultimately were returned to him.  (Id. ¶ 18).
[4]    Mr. Ismael did not seek counseling or medical care related to the incident. (Id. ¶ 22).

C.     Facts Pertinent to Plaintiff Filsan Ahmed

On or about August 31, 2010, Filsan Ahmed travelled on a KLM flight from Atlanta, Georgia to Amsterdam, on her way to her ultimate destination, Nairobi, Kenya.  (Defendant's Responses to Plaintiff's Statement of Additional Material Facts ("RPSOMF") ¶ 105).  On August 29, 2011, Ms. Ahmed and her two daughters planned to return to the United States via Amsterdam on a KLM flight.  (PSOMF ¶ 23).  On her arrival at Jomo Kenyatta International Airport ("JKIA") in Nairobi to return to Atlanta, she passed through security, and made her way to the ticket counter.  (Id. ¶ 24).  All of the KLM employees with whom she interacted at the ticket counter were ethnic Kenyans.  (Id. ¶ 25).  Ms. Ahmed presented her green card, ticket, and Somali passport to a ticket agent.  (Id. ¶ 26).  The ticket agent told her that her Somali passport was not a valid travel document.  (Id. ¶ 27).  After Ms. Ahmed questioned the ticket agent's assertion, the ticket agent called John Thumi.  (Id. ¶ 28).

Mr. Thumi told Ms. Ahmed the American government does not recognize Somali passports.  (Id. ¶ 29).  Ms. Ahmed followed Mr. Thumi to his office.  As

they talked, she stood at his office door.  (Id. ¶ 30).  Ms. Ahmed tried to convince Mr. Thumi her documents were valid.  (Id. ¶¶ 31, 35).[5]

Ms. Ahmed missed her planned flight.  (Id. ¶ 34).  After Mr. Thumi told her she could not travel on her documents, she followed him for 30-45 minutes trying to convince him otherwise.  (Id. ¶ 36).  The following day, Ms. Ahmed went to KLM's office in downtown Nairobi.  (Id. ¶ 37).  On or about September 1, 2011, she met with KLM employee Jurrian Stedler.  (Id. ¶ 38).[6]

A day or two after Ms. Ahmed spoke with Mr. Stedler, Mr. Thumi called her on the phone.  (Id. ¶ 42).  Ms. Ahmed testified that, during this call, Mr. Thumi solicited a bribe, and told her she would need to sign a waiver of her right to sue KLM.  (Id. ¶ 43).  Ms. Ahmed refused to sign a waiver.  (Id. ¶ 44).  She testified that she was afraid she would be stuck at JKIA "with no home, nobody with me." (RPSOMF ¶ 104).[7]

---

[5]     During this encounter, Mr. Thumi did not touch, threaten, or raise his voice to Ms. Ahmed.  (Id. ¶ 32).  He neither prevented her from leaving the office nor told her she could not leave, but did tell her she could not leave on her scheduled flight.  (Id. ¶ 33).

[6]     During this encounter, Mr. Stedler did not touch, threaten, insult, yell or use profanity at Ms. Ahmed.  (Id. ¶¶ 39-40).  Mr. Stedler did not prevent Ahmed from leaving the KLM office and he did not tell her she could not leave.

[7]     Mr. Falag, Ms. Ahmed's husband, contacted his United States Senator who put him in touch with the United States Embassy in Kenya.  The Citizens Service

Ms. Ahmed subsequently traveled to the United States on Qatar Airways on September 18, 2011.  (Id. ¶ 46).

D.    Facts Pertinent to Plaintiff Abdikadir Ali

On December 4, 2011, Mr. Ali planned to travel on a KLM flight from Nairobi, Kenya to the United States, with a stopover in Amsterdam.  (Id. ¶ 48). After showing his passport and itinerary to security personnel, he made his way to the KLM ticket counter.  (Id. ¶ 49).  As he approached the counter, he was escorted to a nearby room where John Thumi was present.  (Id. ¶ 50).  Mr. Ali testified that Mr. Thumi informed him his travel documents were invalid.  (Id. ¶ 51).[8]  Mr. Ali did not lodge any complaints with KLM regarding his treatment.  (Id. ¶ 55).

E.    Facts Pertinent to Plaintiffs A.F. and S.F., Minor Children

Neither Mr. Thumi nor any KLM employees ever touched or yelled at A.F. and S.F., Plaintiff Ahmed's children.  (Id. ¶¶ 56-57).  KLM employees did not yell at Ms. Ahmed in front of her children.  (Id. ¶ 58).  Neither Mr. Thumi nor Mr. Stedler ever directly spoke with the children, and they were not with Ms. Ahmed

---

Unit of this Embassy informed him that it does not recognize Somali passports. (PSOMF ¶ 45).

[8]    Mr. Ali did not believe Mr. Thumi's statement.  (Id. ¶ 52).  During this encounter, Mr. Ali was not physically threatened by Mr. Thumi.  Mr. Ali has not sought counseling or medical treatment as a result of the incident in Kenya.  (Id. ¶¶ 53-54).

when she interacted with Mr. Stedler.  (Id. ¶¶ 60-61).  Ms. Ahmed has not sought counseling for her children as a result of the incident in Kenya, though she stated that she "wanted to go for counseling for the kids but could not afford it."  (Id. ¶ 62).  A.F. and S.F.'s tickets were refunded.  (Id. ¶ 63).

F.      Facts Pertinent to Plaintiff Awil Falag

Mr. Falag, Ms. Ahmed's husband, is the only plaintiff who has asserted a loss of consortium claim.  (Id. ¶ 64).  The incident in Kenya did not and has not affected Mr. Falag's physical relationship with his wife.  (Id. ¶ 66).  Both Mr. Falag and Ms. Ahmed testified that the alleged incidents have not and did not impact their marriage.  (Id. ¶ 67).  Delta Airlines, as a partner of KLM, refunded A.F. and S.F.'s airline tickets, and provided the family with travel vouchers.  (Id. ¶ 68).

G.      Facts Pertinent to KLM

1.      *Customer Complaint System*

KLM customer complaints are typically handled by various customer care centers, each of which has an individual manager.  (RPSOMF ¶ 72).  When a customer makes a remark, KLM personnel ask if the customer wants to file a complaint.  If the customer says yes, the complaint is entered into a complaint system.  (Id. ¶ 74).

8

Karen Plug, a KLM employee who manages lawsuits in which KLM is involved, is not responsible for customer complaints, but testified she investigates certain "strong allegations."  (RPSOMF ¶ 71).  Ms. Plug does not know if any investigations were performed regarding the rate of complaints for fraud and extortion involving Mr. Thumi.  (Id. ¶ 73).  She also testified that bribery is contrary to KLM's Code of Conduct and is also grounds for termination.  (PSOMF ¶ 69).  Ms. Plug testified that KLM's complaint system does not contain a specific code for bribes, and that there is only one database for customer complaints.  (RPSOMF ¶¶ 79, 80).  She testified that no one at KLM's Amsterdam office would be able to determine, by looking at the complaint system, if an employee was soliciting bribes at JKIA.  Any complaint of bribery would have to be would have to be reported to the local KLM office in order for it to be investigated.  (Id. ¶ 81).

Prior to this case, Ms. Plug never had a reason to examine the conduct of John Thumi.  (RPSOMF ¶ 75).  After the lawsuit was filed, Ms. Plug investigated the alleged incidents by:  (1) searching for complaints at JKIA, (2) searching for other lawsuits at JKIA, (3) searching for other complaints of "discrimination," (4) searching for similar claims at the customer care center, and (5) asking KLM's insurance company whether there were similar claims against KLM.  (Id. ¶ 76).  KLM personnel searched Facebook and Twitter for similar complaints.  (Id. ¶ 77).

Ms. Plug searched for discrimination complaints arising out of JKIA.  (Id. ¶ 83).

She also asked KLM's Montreal, Cairo, and Nairobi offices for discrimination

complaints.  (Id. ¶ 84).  The Montreal office did not provide any information on

Suaad Mohamud, an individual who had been detained at JKIA, and Ms. Plug

testified that she has never heard of Suaad Mohamud.  (Id. ¶¶ 78, 85).[9]

Ms. Plug testified that she does not know of any investigations into John

Thumi's conduct.  (Id. ¶ 86).  She believes that KLM's security department would

be responsible for investigating Mr. Thumi if there were allegations of extortion

and fraud.  (Id. ¶ 87).  She testified that an investigation would require a local

manager in Kenya to raise the issue of a bribery complaint with KLM's security

department or upper management.  (Id. ¶ 90).  Ms. Plug did not contact the security

department regarding this lawsuit.  (Id. ¶ 89).  Ms. Plug believes "local

management should look into . . . whether there's a reason to investigate"

Plaintiffs' claims.  (Id. ¶ 92).  Ms. Plug testified that KLM would not have any

record of allegations made in the media and not to KLM.  (Id. ¶ 93).

Ms. Plug believes that the allegations in Plaintiffs' Complaint would rise to

the level of an investigation whether or not a lawsuit was filed.  (Id. ¶ 94).  Marijke

---

[9]     Plaintiffs do not set forth any additional facts or argument regarding Suaad Mohamud.

Schep, a KLM employee responsible for pre-boarding document screening procedures, (Marijke Schep Dep. [112] at 7), testified that the allegations in this lawsuit should cause an investigation by KLM's security department.  She does not know if an investigation was ever opened, and she did nothing to investigate attempted bribery or extortion at JKIA.  (Id. ¶¶ 95, 96).  She testified that ethnic Somalis are in KLM's "top ranking" for documentation issues in transportation.  (Id. ¶ 97).  She also testified that Ms. Ahmed's travel documents are not accepted by the Dutch government.  (PSOMF ¶ 70).

KLM's Conditions of Carriage provides:  "The Carrier reserves the right . . . to refuse carriage if a Passenger does not comply with the laws and regulations in force, if the Carrier has doubts as to the validity of the documents presented."  (RPSOMF ¶ 103).

2.   *Prior Complaints Regarding Mr. Thumi*

On September 6, 2011, KLM received a post on its Facebook account from Ahmed Ali Mashavu, stating:

> I have heard so many complains [sic] from pple [sic] who have recently travelled to kenya [sic] via KLM AIRLINES.  I think its time for us to put an end to this harassment and hardships that SOMALIS from abroad tend to encounter.  Specific individuals like JOHN THUMI@ [sic] the airport location in Nairobi Kenya shouldn't be the face for KLM AIRLINES.  If such crooks remain in charge, then it's up to us to put pressure on KLM AIRLINES to put an end to it.  U [sic] could be JOHN THUMI's next victim.

(<u>Id.</u> ¶ 98).  On September 6, 2011, another individual, "Nephew Hamza," wrote on

KLM's Facebook account:

> KLM please we would like for you to really look into this case and
> clean your house in Nairobi coz [sic] it gives KLM a bad name as a
> whole.  The bribery taking is rampant and all Somalis living in the
> diaspora are warning each others [sic] from taking your alines due to
> some bad apples who have no regard to customer service.

(<u>Id.</u> ¶ 99).  Ms. Plug testified that she does not know of any investigations

concerning these complaints.  (<u>Id.</u> ¶ 100).

Plaintiff Falag emailed customer service at Delta alleging Mr. Thumi

extorted Ms. Ahmed.  (<u>Id.</u> ¶ 100[10]).  Delta employees represent KLM in the United

States.  Delta forwards, to KLM, information on complaints similar to those

involved in this lawsuit.  In such instances, Delta enters the complaint information

into their system and forwards the complaint to KLM electronically.  (<u>Id.</u> ¶ 101).

## II.   LEGAL STANDARD

Summary judgment is appropriate where the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter

of law.  <u>See</u> Fed. R. Civ. P. 56.  The party seeking summary judgment bears the

---

[10]    Plaintiffs repeated paragraph 100 twice.  This citation is to the second
paragraph numbered 100.

burden of demonstrating the absence of a genuine dispute as to any material fact.

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the

moving party has met this burden, the nonmoving party must demonstrate that

summary judgment is inappropriate by designating specific facts showing a

genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282

(11th Cir. 1999).  The nonmoving party "need not present evidence in a form

necessary for admission at trial; however, he may not merely rest on his

pleadings."  Id.

        "At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two

different stories, one blatantly contradicted by the evidence, the Court is not

required to adopt that version of the facts when ruling on summary judgment.  Id.

"[C]redibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at

1282.  "If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  The party

opposing summary judgment "'must do more than simply show that there is some

metaphysical doubt as to the material facts . . . .  Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

**III.   ANALYSIS**

   A.   Vicarious Liability

KLM argues that it is not vicariously liable under a theory of respondeat superior for torts committed by employees who act with "purely personal motivation."  (Mot. at 3).  It argues that summary judgment therefore should be granted on Plaintiffs' claims for false imprisonment, fraud, conversion, and intentional infliction of emotional distress.  (Id.).[11]  KLM states that "Plaintiffs have propounded no evidence whatsoever that KLM granted its employees the

---

[11]   The claims for false imprisonment, fraud, conversion, and intentional infliction of emotional distress against Mr. Thumi and Mr. Stedler are no longer at issue, because Mr. Thumi and Mr. Stedler have been voluntarily dismissed from this case.  ([106]).

authority to run a discriminatory extortion ring at Nairobi Airport, which would be required to succeed on [its claims] under Georgia law."  (Id.).

Plaintiffs argue that KLM is liable under respondeat superior for Mr. Thumi's conduct because it knew or should have known of Mr. Thumi's previous conduct, and did nothing to investigate or stop the conduct.  (Resp. [125] at 3-4). In support of this argument, Plaintiffs point to the September 6, 2011, posts made on KLM's Facebook page, alleging "harassment and hardships" and bribery by John Thumi.  (Resp. at 4).

Georgia courts will hold an employer responsible for the conduct of its employee if the employee acted in the course of the employer's business and with a desire to benefit the employer.  Bennett v. U.S., 102 F.3d 486, 489 (11th Cir. 1996) (citing Wallace v. ARA Servs., Inc., 365 S.E.2d 461, 463 (Ga. Ct. App. 1988)).  An employer generally is not liable for an employee's intentional torts. Trimble v. Circuit City Stores, Inc., 469 S.E. 2d 776 (Ga. Ct. App. 1996).  "When an employee undertakes an act purely personal in nature, no respondeat superior liability may be imposed."  Id. (citing Worstell Parking, Inc. v. Aisida, 442 S.E.2d 469, 470-71 (1994)); see also Travis Pruitt & Assocs., P.C. v. Hooper, 625 S.E.2d 445, 449 (Ga. Ct. App. 2005) (holding that an employer cannot be held liable for

sexual harassment committed by an employee "for purely personal reasons entirely disconnected from the employer's business").

In Travis Pruitt, the Georgia Court of Appeals held that, "for liability to be imposed on the employer by ratification, there must be evidence that the employee's conduct was done in furtherance of the employer's business and within the scope of employment.  Travis Pruitt, 625 S.E.2d at 449.  "[T]he long-established rule is that, where an employee was acting solely for himself . . . there is no such thing as a master assuming, by ratification, liability for an act of another in which the master had no part."  Id. (internal quotation marks omitted).

 Mr. Thumi's actions, "being purely personal in nature, are unrelated to [his] duties and, therefore, are outside the scope of employment because they were not in furtherance of [KLM]'s business."  Alpharetta First United Methodist Church v. Stewart, 472 S.E.2d 532, 536 (1996).  KLM could not have ratified Mr. Thumi's actions, because, under Georgia law, an employer cannot be held liable on a ratification theory for intentional acts of an employee where there is no "evidence that the employee's conduct was done in furtherance of the employer's business and within the scope of employment."  Travis Pruitt, 625 S.E.2d at 449.  Plaintiffs fail to offer any evidence that the false imprisonment, fraud, conversion, and

intentional infliction of emotional distress in which Mr. Thumi allegedly engaged

benefitted KLM in any way, or that Mr. Thumi was not acting solely for his own

benefit.  Plaintiffs do not allege that Mr. Thumi's conduct was intended to benefit

anyone other than himself.  Without any evidence to the contrary, the only

reasonable conclusion is that Mr. Thumi's alleged extortion attempts were, in fact,

solely for his personal benefit.[12]  On these facts, Plaintiffs fail to create an issue of

material fact as to whether KLM may be held liable for its employees' intentional

acts.  The Court thus grants KLM's summary judgment motion on Plaintiffs'

claims for false imprisonment, fraud, conversion, and intentional infliction of

emotional distress.

      B.    <u>Violation of Georgia RICO Act and 42 U.S.C. § 1981</u>

KLM argues that Plaintiff's claims under the Georgia RICO Act, O.C.G.A.

§ 16-14-1 <u>et seq.</u>, should be dismissed as a matter of law because overseas conduct

---

[12]    Plaintiffs argue that the September 6, 2011, Facebook posts support that KLM knew or should have known of Mr. Thumi's conduct.  However, the only Plaintiff whom Mr. Thumi interacted with *after* September 6, 2011, was Mr. Ali. Plaintiffs also argue that Ms. Schep and Ms. Plug's testimony shows that KLM did not investigate the claims at issue in this case, thereby establishing that KLM ratified Mr. Thumi's actions.  Both arguments fail because, as noted above, there is no "evidence that the employee's conduct was done in furtherance of the employer's business and within the scope of employment," <u>Travis Pruitt</u>, 625 S.E.2d at 449, and, in the absence of such evidence, an employer cannot ratify its employee's actions.

cannot form the basis of a Georgia RICO claim.  (Mot. at 10).  Plaintiffs do not

contest KLM's motion for summary judgment on Plaintiffs' Georgia RICO claim,

(Resp. at 19), and summary judgment is granted on this claim.  KLM also moves

for summary judgment on Plaintiffs' claim under 42 U.S.C. § 1981, on the ground

that Section 1981 does not apply extraterritorially.  Plaintiffs do not contest KLM's

motion for summary judgment on their Section 1981 claim, (Resp. at 19), and

summary judgment is granted on this claim.

     C.    <u>Breach of Contract of Carriage</u>

    KLM next moves for summary judgment on Plaintiffs Ahmed and Ismael's

claims for breach of contract of carriage.  KLM argues that the Montreal

Convention preempts Plaintiffs' claims because the claims are tied to a delay in

carriage.  Plaintiffs argue that their claims are not preempted by the Montreal

Convention because KLM's actions constituted total non-performance of their

contract.

    The Montreal Convention[13] "sets forth uniform rules for claims that arise out

of incidents that occur during international air transportation." <u>Marotte v. Am.

Airlines, Inc.</u>, 296 F.3d 1255, 1258-59 (11th Cir.2002).  To determine "whether a

---

[13]    Convention for the Unification of Certain Rules for International Carriage
by Air, May 28, 1999, S. Treaty Doc. No. 106–45, 1999 WL 33292734 (2000).

claim falls within the scope of the Convention, courts 'are directed to look to its liability provisions.'" <u>Oparaji v. Virgin Atl. Airways, Ltd.,</u> No. 04-CV-1554(FB), 2006 WL 2708034, at *2 (E.D.N.Y. Sept. 19, 2006) (brackets omitted) (quoting <u>King v. Am. Airlines, Inc.,</u> 284 F.3d 352, 358 (2d Cir. 2002)).

The Convention imposes three categories of strict liability on air carriers. <u>Benjamin v. Am. Airlines, Inc.,</u> 32 F. Supp. 3d 1309, 1315 (S.D. Ga. 2014). Where one of these categories applies, the treaty "preempts the remedies of a signatory's domestic law, whether or not the application of the Convention will result in recovery in a particular case." <u>Best v. BWIA W. Indies Airways Ltd.,</u> 581 F.Supp.2d 359, 362 (E.D.N.Y. 2008). KLM focuses exclusively on Article 19 and its preemptive force. Article 19 provides that "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo." Montreal Convention art. 19. Although the term is not defined by the Convention and has been left to the courts for interpretation, "delay" contemplates a situation where "the air carrier properly delivered baggage or persons to the appropriate destination but it did so in [an] untimely manner." <u>Vumbaca v. Terminal One Grp. Ass'n L.P.,</u> 859 F.Supp.2d 343, 366 (E.D.N.Y. 2012).

"By its plain language, Article 19 governs only claims for delay, not non-performance of a contract." <u>Benjamin</u>, 32 F. Supp. 3d at 1317 (citing cases).

The Court conducts the following analysis to assess whether a party's claim for

breach of contract is preempted:

> If the airline ultimately transports the passenger or the passenger refuses the airline's offer of a later flight, the claim will be for delay, governed by the Montreal Convention.  Where the airline simply refuses to fly passengers, without offering alternate transportation, then the claim will likely be for nonperformance.

Benjamin, 32 F. Supp. 3d at 1317 (internal citations and brackets omitted).

Here, KLM argues that it ultimately transported Mr. Ismael to his destination

the day after his originally-scheduled flight, and his claims therefore fall under

Article 19 of the Montreal Convention.  However, the facts show that both

Mr. Ismael and Ms. Ahmed had to obtain separate tickets from other airlines to

depart Kenya and reach their ultimate destination.[14]  "Rather than provide

alternative transportation as part of the same contract, Defendant forced the

[passenger] to enter into an entirely new contract for carriage."  Benjamin, 32 F.

---

[14]      KLM falsely states that Mr. Ismael and Ms. Ahmed "were undisputedly offered alternative transportation to their originally-scheduled destination at no extra charge without KLM requiring them to purchase new tickets," and that the alternative transportation in each case was offered "by KLM."  (Reply at 8).  KLM's citations do not support these assertions, and in fact refute them.  Mr. Ismael's testimony, cited by Plaintiffs in their objection to Defendant's Statement of Material Fact ¶ 21, makes clear that Mr. Ismael had to obtain a separate ticket from Delta.  (Ismael Dep. Tr. [111] at 85:24-86:8).  Ms. Ahmed's alternative transportation also was provided by a different airline, Qatar Airways.  (PSOMF ¶ 46).

Supp. 3d at 1318. KLM failed to fulfill its obligation to transport Mr. Ismael and Ms. Ahmed under their respective first contracts for carriage, and thus their claims do not fall under Article 19's provision for delay because KLM did not offer an alternative means of travel without additional consideration. See id.

KLM also moves for summary judgment on Ms. Ahmed's breach of contract of carriage claim, arguing that an airline does not have a duty to inform its passengers of a destination country's customs and immigration laws. In support of its argument, KLM points to its Conditions of Carriage Article XIII(2)(b), which states: "The Carrier reserves the right . . . to refuse carriage if a Passenger does not comply with the laws and regulations in force, if the Carrier has doubts as to the validity of the documents presented." (PSOF ¶ 103). KLM also cites Edem v. Ethiopian Airlines Enter., No. 08 CV 2597(RJD)(LB), 2009 WL 4639393, at *7 (E.D.N.Y. Sept. 30, 2009).

In Edem, the plaintiff alleged that the defendant airline failed to inform him of certain customs regulations of Ethiopia, causing him to be detained by customs officials upon his arrival there. Id. at *7. The plaintiff alleged claims of breach of duty of good faith and fair dealing, negligence, and vicarious liability, among others. Id. The court held that the plaintiff was responsible for complying with customs regulations, and granted defendant's motion to dismiss. Id. at *8.

21

In Hunter v. Deutsche Lufthansa AG, the court distinguished the Edem opinion on facts analogous to those here. 863 F. Supp. 2d 190, 209-210 (E.D.N.Y. 2012). In Hunter, unlike Edem, the plaintiff alleged that the defendant "*affirmatively misinformed* him after plaintiff *specifically inquired* about whether transporting weapons in accordance with the proposed flight changes would pose any legal consequences." Id. at 209 (emphasis in original). The court therefore denied defendant's motion to dismiss Hunter's negligence claim.

Here, Ms. Ahmed presents evidence that Mr. Thumi affirmatively misinformed her of the legal status of her documents after she specifically contested Mr. Thumi's assertions that her documents were insufficient.[15] Mr. Thumi told Ms. Ahmed that she could not travel with the documents she presented. Ms. Ahmed's documents included her green card and Somali passport. Mr. Thumi's assertion that Ms. Ahmed could not travel with those documents is cast into doubt by the evidence showing that Ms. Ahmed ultimately was able to

---

[15] KLM argues that Plaintiffs do not dispute that the reason for Ms. Ahmed's delay was that KLM employees doubted whether she would be permitted to enter the Netherlands for her originally-scheduled stopover. (Reply at 7-8 (citing PSOMF ¶ 27)). The statement of material fact KLM cites only shows that Plaintiffs do not dispute that a KLM employee told Ms. Ahmed that "her Somali passport was not a valid travel document." (PSOMF ¶¶ 26, 27). Neither Plaintiffs nor KLM has offered evidence that Ms. Ahmed's "delay" was caused by doubts as to whether she would be permitted to enter the Netherlands.

travel to the United States on Qatar Airways, presumably using the same travel documents.  Mr. Ismael, too, traveled to the United States after obtaining a new ticket through Delta.  Mr. Ismael, who traveled one day after his originally-scheduled flight, presumably used the same documents he initially presented to Mr. Thumi, which he was told were insufficient.  Mr. Ali travelled to the United States on his originally-scheduled KLM flight by paying Mr. Thumi a $400 bribe, after Mr. Thumi told him his travel documents were invalid.  This circumstantial evidence is sufficient to support that Mr. Thumi's assertion that Ms. Ahmed's documents were insufficient was made to further his purpose of extracting a bribe from Ms. Ahmed.  KLM does not offer other persuasive argument or authority to support their summary judgment motion on Plaintiffs' breach of contract of carriage claims.  Accordingly, KLM's motion for summary judgment is denied on Plaintiffs' claims for breach of contract of carriage.

   D. <u>Breach of Covenant of Good Faith and Fair Dealing</u>

   KLM seeks summary judgment on Plaintiffs' claims for breach of covenant of good faith and fair dealing.  KLM argues that "the common law requirement of good faith and fair dealing is not an independent source of duties for the parties to a contract."  (Mot. at 20 (citing <u>Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.</u>, 426 F. Supp. 2d 1356, 1370 (N.D. Ga. 2006))).  KLM argues that Plaintiffs

have not alleged breach of any specific term of their contracts of carriage that form the basis of a cause of action separate and distinct from their breach of contract claims.  (Id. at 20-21).  Plaintiffs respond by listing specific bad faith breaches on the part of KLM against Mr. Ali, Ms. Ahmed, and Mr. Ismael.

In Georgia, "[e]very contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement."  Myung Sung Presbyterian Church, Inc. v. N. Am. Ass'n of Slavic Churches & Ministries, Inc., 662 S.E.2d 745, 748 (2008).  There is no independent cause of action for breach of the covenant of good faith and fair dealing under Georgia law.  Stuart Enters. Intern., Inc., v. Peykan, Inc., 555 S.E.2d 881, 883-84 (Ga. Ct. App. 2001).  As the Eleventh Circuit has explained:

> [The implied covenant of good faith and fair dealing] is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms de facto when performance is maintained de jure. But it is not an undertaking that can be breached apart from those terms.

Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990) (citations omitted).  The implied covenant cannot be breached independently of "the contract provisions it modifies."  Myung Sung, 662 S.E.2d at 748.  Thus, to state a claim for breach of the implied duty of good faith and fair dealing, "a plaintiff must set forth facts showing a breach of an actual term of an agreement."

Am. Casual Dining, 426 F. Supp. 2d at 1370 (citations omitted); See also Clark

v. Aaron's, Inc., 914 F. Supp. 2d 1301, 1308 (N.D. Ga. 2012) ("[T]o state a claim

for breach of the implied covenant, the plaintiff must be found to have stated a

claim for breach of contract (since the implied covenant cannot be breached

independently of an express contract term.").

   "The duty of Good Faith and Fair Dealing requires that you examine the acts

taken with discretion to determine whether they were arbitrary or egregious." Am.

Mgmt. Servs. E., LLC v. Fort Benning Family Cmtys., LLC, 774 S.E.2d 233, 246

(Ct. App. Ga. 2015); see also Ameris Bank v. Alliance Investment & Mgmt. Co.,

LLC, 739 S.E.2d 481 (Ga. Ct. App. 2013) ("[W]here the manner of performance of

a contractual provision is left more or less to the discretion of one of the parties to

the contract, he is bound to the exercise of good faith." (alterations omitted)).

   The Court previously has stated that "[t]he foregoing authority does not

support Defendant's argument that the causes of action for breach of the implied

covenant and breach of contract are duplicative; on the contrary, the causes of

action are separate and distinct and may be pled simultaneously." Clark, 914 F.

Supp. 2d at 1308 (N.D. Ga. 2012) (citing cases) (internal quotation marks omitted).

As discussed above, Plaintiffs' breach of contract claims survive summary

judgment.  The Court finds that Plaintiffs have created a triable issue on their claim

25

for breach of the implied covenant because they set forth "facts showing a breach of an actual term of an agreement."  Am. Casual Dining, 426 F. Supp. 2d at 1370. Plaintiffs argue that KLM egregiously breached its Conditions of Carriage Article XIII(2)(b), which states:  "The Carrier reserves the right, in accordance with Article VII Paragraph 1, to refuse carriage if a passenger does not comply with the laws and regulations in force, if the Carrier has doubts as to the validity of the documents presented."  (PSOMF ¶ 103).  Plaintiffs offer specific instances of alleged bad faith breaches of this article.[16]  Plaintiffs' evidence of bribery solicitations is sufficient to create an issue of disputed fact whether the alleged breaches were "arbitrary or egregious," because they lend support to Plaintiffs' argument that Mr. Thumi's statements regarding the validity of Plaintiffs' travel documents were made in bad faith.[17]  See Am. Mgmt., 774 S.E.2d at 246.

---

[16]     Plaintiffs argue that, with respect to Mr. Ali, KLM employees' extraction of a bribe is a breach of the covenant of good faith and fair dealing as to the relevant portion of KLM's Conditions of Carriage.  As to Ms. Ahmed, Plaintiffs argue that KLM employees' assertions that her documents were invalid as well as Mr. Thumi's bribe demand constitutes a breach.  Plaintiffs similarly argue, with respect to Mr. Ismael, that the bribe demand and untrue statements regarding travel documentation constitute a breach of the covenant of good faith and fair dealing. (Resp. at 13-14).

[17]     "[A] corporation . . . acts through its agents . . . ."  Langford v. Milwaukee Ins. Co., 113 S.E.2d 165, 167 (Ct. App. Ga. 1960).  Here, there is evidence that Mr. Thumi had either actual or apparent authority to act on behalf of KLM in its performance under the carrier contract.  See Holcomb v. Evans, 337 S.E.2d 435,

Accordingly, KLM's motion for summary judgment is denied on Plaintiffs' claims for breach of covenant of good faith and fair dealing.

      E.    <u>Negligent Hiring, Training, Supervision, and Retention</u>

KLM moves for summary judgment on Plaintiffs' negligence claims, arguing that Plaintiffs' claims fail because they cannot show that KLM knew or should have known of its employees' alleged incompetency or dangerous propensities.  (Mot. at 21).  KLM argues that Plaintiffs fail to present any evidence to show that KLM had knowledge of any tendency on the part of Mr. Thumi or Mr. Stelder to engage in conduct amounting to wrongful denial of travel to the United States.  (<u>Id.</u> at 22).  KLM also argues that Plaintiffs fail to present any evidence that KLM received Mr. Ismael's and Mr. Falag's complaints to Delta, and therefore KLM did not have notice regarding Mr. Ali's situation.  (<u>Id.</u>).

Under Georgia law:

> An employer may be liable for hiring or retaining an employee the employer knows or in the course of ordinary care should have known was not suited for the particular employment. When an incompetent employee is hired for a particular position, it is reasonably foreseeable that such employee may injure others in the negligent performance of the duties of that position and accordingly an employer may be held liable for injuries caused by the negligent performance of the incompetent employee where evidence shows the employer knew or

---

436 (Ct. App. Ga. 1985) (holding an employer liable for breach of contract, under principles of agency, where employee breached contract with apparent authority).

should have discovered that incompetency. However, absent a causal
connection between the employee's particular incompetency for the
job and the injury sustained by the plaintiff, the defendant employer is
not liable to the plaintiff for hiring an employee with that particular
incompetency.

Poole v. N. Georgia Conference of Methodist Church, Inc., 615 S.E.2d 604, 606-

607 (Ga. Ct. App. 2005).  "The analysis for a cause of action for negligent

retention is essentially the same as the analysis for vicarious liability.  However,

there is no requirement under Georgia law that a victim make his complaint to a

superior management:  any complaint to any manager is sufficient to put the

employer on notice."  Chambers v. Wal-Mart Stores, Inc., 70 F. Supp. 2d 1311,

1322 (N.D. Ga. 1998).

The Court finds that Plaintiffs fail to show an issue of disputed fact that

KLM knew or should have known of any tendency on the part of Mr. Thumi or

Mr. Stelder to engage in the conduct alleged in this case.  Plaintiffs specifically fail

to present evidence that KLM managers were aware of Mr. Thumi or Mr. Stelder's

alleged propensity to discriminate in allowing boarding on KLM aircraft, and

Plaintiff does not appear to contest the issue of KLM's knowledge.  Plaintiffs' only

response to KLM's argument is that KLM's complaint system and investigations

were "woefully inadequate."  (Resp. at 15).[18]  This argument, however, is not

sufficient to support a claim of negligent retention.  See Chambers, 70 F. Supp. 2d

at 1322 (holding that a company is not liable for negligent retention under Georgia

law for failing to investigate prior to receipt of a formal written complaint, even if

"it may be deemed good business practice to have initiated an informal

investigation").  Plaintiffs also fail to present any evidence that Mr. Thumi or Mr.

Stelder would use their positions to personally profit.  Plaintiffs do not present any

evidence regarding Mr. Thumi's or Mr. Stelder's hiring, training, supervision or

retention that could form the basis of a negligence claim.

Because Plaintiffs fail to present a valid claim of negligence, KLM's motion

for summary judgment is granted on Plaintiffs' claims for negligent hiring,

training, supervision, and retention.

---

[18]     Though Plaintiffs fail to raise the argument, the September 6, 2011,
Facebook posts could only support an argument that KLM knew or should have
known of Mr. Thumi's conduct with respect to Mr. Ali, because Mr. Ali was the
only Plaintiff whose alleged incident occurred after the September 6, 2011
Facebook posts.  Plaintiffs, however, do not raise, and the Court finds no support
for, the argument that the Facebook posts alone can establish KLM's liability
under a theory of negligent hiring or supervision.  Plaintiffs also do not present any
evidence that any KLM managers were aware of the Facebook posts.

F.     Loss of Consortium

KLM next seeks summary judgment on Mr. Falag's loss of consortium

claim.[19]  Under Georgia law, a claim for loss of consortium is "based on the loss of

a property right growing out of the marriage relationship, and includes the

exclusive right to the services of the spouse and to the society, companionship, and

conjugal affection of each other."  Sevcech v. Ingles Markets, Inc., 474 S.E.2d 4, 8

(Ga. Ct. App. 1996) (internal quotation marks omitted).  Here, as in Sevcech, it is

undisputed that "the incident has not in any way changed [Mr. Falag's] home life

or relationship with [his wife], including [his] physical relationship."  Id.  The

evidence shows that the incident in Kenya did not and has not affected Mr. Falag's

physical relationship with his wife.  Both Mr. Falag and Ms. Ahmed testified that

the alleged incidents have not and did not impact their marriage.[20]  Accordingly,

---

[19]     KLM asserts, and Plaintiffs do not contest, that although the First Amended
Complaint includes a claim for loss of consortium on behalf of all Plaintiffs,
Plaintiffs' counsel has acknowledged that only Mr. Falag asserts such a claim.  In
any case, Plaintiffs have not presented any evidence or argument in support of a
loss of consortium claim for any plaintiff other than Mr. Falag.

[20]     Plaintiffs argue that the relevant analysis should focus on the loss of
consortium that occurred during the time that Ms. Ahmed was "stranded in
Nairobi, Kenya."  (Resp. at 16-17).  Even assuming that this is the proper inquiry,
Plaintiffs do not offer any evidence that Mr. Falag and Ms. Ahmed's home life or
relationship were affected during this period.  Indeed, Plaintiffs do not offer any
evidence at all regarding Mr. Falag and Ms. Ahmed's relationship during the time
Ms. Ahmed was in Nairobi.

the Court grants KLM's motion for summary judgment on Plaintiff Falag's claim for loss of consortium.

G.   Claim for Punitive Damages

"It is axiomatic that punitive damages are not recoverable for breach of contract, even if the breaching party acted in bad faith . . . ." Paul Dean Corp. v. Kilgore, 556 S.E.2d 228, 234 (Ga. Ct. App. 2001) (internal quotation marks omitted) (citing Mikart, Inc. v. Marquez, 438 S.E.2d 633 (1993); O.C.G.A. § 13-6-10).[21]  Because the only surviving claims are for breach of contract and breach of covenant of good faith and fair dealing, summary judgment is granted on Plaintiffs' claim for punitive damages.

H.   Claim for Attorneys' Fees

KLM next seeks summary judgment on Plaintiffs' claim for attorneys' fees. Georgia law provides:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

---

[21]  "In certain rare situations, where the breach of contract entails an act of fraud, punitive damages may be imposed, but, as discussed above, since [Plaintiffs] failed to demonstrate a cause of action in fraud [against KLM], punitive damages are unavailable in the instant use." Parsells v. Orkin Exterminating Co., Inc., 322 S.E.2d 91, 93 (Ga. Ct. App. 1984) (citations omitted).

O.C.G.A. § 13-6-11.  KLM argues that Plaintiffs' First Amended Complaint contains a prayer for attorneys' fees, but does not contain a count for attorneys' fees.  KLM argues that Plaintiffs' failure to specially plead a claim of attorneys' fees "contravenes the statute, which requires plaintiffs to 'specially plead[] *and* pray for attorneys' fees."  (Mot. at 29 (emphasis in original)).

Plaintiffs' prayer seeks attorneys' fees under O.C.G.A. § 13-6-11 based on "Air France-KLM's bad faith breach of the Contracts of Carriage and fraudulent misrepresentations regarding same."  (Compl. at 49).  Plaintiffs argue that their First Amended Complaint adequately pleads attorneys' fees, because it repeatedly requests "damages sufficient to reimburse [Plaintiffs] for the above-incurred injuries and costs, as well as all costs deemed just and proper."  (Compl. ¶¶ 144, 151).  The Court finds that Plaintiffs' pleadings for "all costs deemed just and proper" do not suffice under the special pleading standards of O.C.G.A. § 13-6-11.  The plain language of the statute required Plaintiffs to have "specially pleaded" attorneys fees' in addition to making a prayer for attorneys' fees.  See Pipe Solutions, Inc. v. Inglis, 661 S.E.2d 683, 686 (Ga. Ct. App. 2008) ("Because appellant failed to plead damages specially pursuant to O.C.G.A. § 13-6-11 . . . it is not entitled to recover them pursuant to the statute."); Daniels v. Price Commc'ns Wireless, Inc., 562 S.E.2d 844, 846 (Ga. Ct. App. 2002) (claim for attorneys' fees

32

under O.C.G.A. § 13-6-11 failed because "although [plaintiff's] prayer included a paragraph reading '[a]ttorney fees and costs of litigation,' he did not 'specially plead[]' for them as required by that statute"); Rowell v. Rowell, 94 S.E.2d 425 (Ga. 1956) (holding an award of attorneys' fees "clearly erroneous" where "the defendant in error does not allege that the plaintiff in error was stubbornly litigious and does not pray for the award of attorney's fees."). Outside of Plaintiffs' prayer, the First Amended Complaint fails to specially plead attorneys' fees, and fails to allege the factual basis for seeking those fees. The First Amended Complaint fails to tie any allegations of bad faith to a request for attorneys' fees.[22]

Further, under Georgia law, "the prayer is not an allegation in the complaint which requires an answer (OCGA § 9-11-8(d)) and is not part of plaintiffs' cause of action." Holloman v. D.R. Horton, Inc., 524 S.E.2d 790, 795-96 (Ga. Ct. App. 1999); see also Drug Emporium v. Peaks, 488 S.E.2d 500 (1997) (no claim for punitive damages when no separate count in complaint, even though prayer for relief requested punitive damages). This case law further supports that Plaintiffs'

---

[22] Even if Plaintiffs' First Amended Complaint properly stated a claim of attorneys' fees, this claim only would be against Air France-KLM, not KLM. The prayer for relief specifically states that Plaintiffs seek attorneys' fees "based on defendant Air France-KLM's" actions. (Compl. at 49). There is no conduct alleged by Air France-KLM to support a claim of attorneys' fees against this defendant.

prayer for attorneys' fees, standing alone, is insufficient under the pleading

requirements of O.C.G.A. § 13-6-11.  Accordingly, KLM's motion for summary

judgment on Plaintiffs' claim for attorneys' fees is granted.[23, 24]

## IV.  CONCLUSION

For the foregoing reasons,

---

[23]   Plaintiffs' First Amended Complaint also names as defendants John Does 1-12 (the "John Doe Defendants").  (Compl. ¶ 23).  Fictitious party pleading is not permitted in federal court, unless plaintiff's description of the fictitious defendants is so specific as to be, at the very worst, surplusage.  Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010).  Plaintiffs describe the John Doe Defendants as individuals who "aided defendants . . . in targeting Plaintiffs and preventing Plaintiffs from embarking on travel to the United States of America by providing false information about travel documents."  (Compl. ¶ 23).  Plaintiffs have not provided any evidence regarding the identities or actions of the John Doe Defendants, and the John Doe Defendants are required to be dismissed from this action.

[24]   Although Air France-KLM did not join in KLM's summary judgment motion or file a summary judgment motion of its own, the Court's Opinion and Order applies equally to Plaintiffs' claims against Air France-KLM.  See Artistic Entm't, Inc. v. City of Warner Robins, 331 F.3d 1196, 1202 (11th Cir. 2003) ("[W]here a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided.").  Air France-KLM is "a holding company that owns and operates the KLM airline."  (Compl. ¶ 14).  The facts and claims regarding Air France-KLM and KLM are, for all intents and purposes, identical in this matter. The two parties share the same counsel, and it is apparent that Plaintiffs have presented all relevant evidence.  Under these circumstances, the Court finds that formal notice to the parties is not required, and it is appropriate to grant summary judgment on Plaintiffs' claims against Air France-KLM.  See Imaging Bus. Machines, LLC. v. BancTec, Inc., 459 F.3d 1186, 1191 (11th Cir. 2006) ("A district court may enter summary judgment sua sponte if the parties are given adequate notice that they must present all of their evidence.").

**IT IS HEREBY ORDERED** that Defendant Koninklijke Luchtvaart Maatschappij, N.V. d/b/a KLM Royal Dutch Airlines' ("KLM") Motion for Summary Judgment [108] ("Motion") is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is denied on Plaintiffs' claims for breach of contract of carriage and breach of covenant of good faith and fair dealing.  The Motion is granted on Plaintiffs' remaining claims.

**IT IS FURTHER ORDERED** that summary judgment is **DENIED** on Plaintiffs' claims against Air France-KLM for breach of contract of carriage and breach of covenant of good faith and fair dealing.  Summary judgment is **GRANTED** on Plaintiffs' remaining claims against Air France-KLM.

**IT IS FURTHER ORDERED** that Defendants John Doe 1-12 are **DISMISSED**.

**SO ORDERED** this 25th day of February, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE